Good morning. Okay, I think your friend is about seated. Okay, please proceed. Good morning and may it please the court. My name is Eric McFarland. I'm appearing on behalf of the appellant M & T Farms. We're here because there's a simple error, we believe in the record. It's the primary error and that error is that the district court concluded that the RMA FCIC could reasonably construe the direct sales of an entity called B & T Farms as farm activity where that entity neither produced farm commodities nor reported any farm income or expenses on farm schedule F. And from that error, that primary error, the district court then believed they had to apply what's called our deference to the RMA FCIC's decision. Let me ask you this, counsel. We talk about our deference, but that usually is the agency's construction of its own regulation. Is there a regulation in this case? A published regulation in the Federal Reporter? No, that's a good question and I don't believe that is the case. So how could there be our deference? Perhaps the issue is that the deference would be where in this case we're dealing essentially with a policy which is a contract. There has been power delegated to the RMA FCIC to develop these contracts. They did develop it. I assume there would be some room for deference for them there. Yeah, there are. I mean, it's not in your interest to urge this, but you have an urge that there's no our deference here. You just urge that our deference shouldn't be accorded because their interpretation is unreasonable. That's exactly my point. And there are a couple circuit decisions that do accord our deference to their policy constructions. I just want to follow up to this degree. As my colleague points out, there are other circuits that have concluded there's our deference even though there's no regulation. Should we adopt that approach? And if so, why? Should you adopt the approach that there is no our deference? No, that there is our deference. In other words, we don't have a case that says that what happened here is, in my judgment, subject to our deference because there's no our deference. My colleague points out that there are a couple of circuits that have said, notwithstanding that fact, that what has been decided in this case is entitled to our deference. So I'm asking you, do you think we should adopt the approach of the other two circuits, finding that our deference applies? And if so, why? Well, I think just as a practical matter, there would be a space for our deference. Yeah. It's strange. Obviously, you don't want our deference. Maybe I think, yeah. Maybe we ought to ask. Why don't you tell us? We ought to ask the government this. Right. But I am correct in saying you haven't made that argument anywhere in this case. I have not, and I certainly don't. I just simply think that our deference, whatever the case is, wouldn't apply in our case because there's a clear policy here. Okay. So I want to ask you about the policy. Yes. And it's maybe only those people who've dealt with this policy can think that it's clear. But I want to sort of work through it. I also want to know whether you personally knew our... I'm just kidding. Okay. The issue, there's no doubt in this case that your client reports only a fraction of the activities done by P&T, correct? Put aside whether they're primary activities or not. Well, the fraction, to be clear, I believe the fraction really is between... It's the two partners. Yeah. Entity B and individual C. Right. So there's no dispute about that. None. Each of them only reports a fraction. And so it seems to me the ultimate question in the case is whether the fraction they're reporting is a farming activity by B&T, correct? That's exactly right. Okay. And now I go back to the policy that seems to define direct marketing of commodities as a farming activity. And there's no doubt that B&T engages in direct marketing of commodities. That's right. Okay. So what am I missing? Well, I think the part that's missing is the essential ingredient that then makes it crystallize as in fact distinct and separate farming activity. And for us that is there are various elements including production of goods. That's not occurring here. But the policy says that selling goods... And I'll get to that. Selling goods produced by others... Done in a certain way. Produced by others is still farming activity. Well, we do have instances obviously of commissioned merchants who sell goods produced by others and they're certainly not engaged in farming activities. That makes sense. And it's clear because a commissioned merchant will be reporting commissions as income. They're not going to report income on farm schedule F. But what are B&T's revenues other than farm revenues? B&T actually has no revenue. B&T reports no revenue. Well, because it's a partnership. The partners are required to... But you're reporting a fraction of B&T's revenue, correct? As the record stands, B&T actually reports no revenue or expense. Now whether they should or should not, that... Well, that's part of the reason why they'd be disqualified because those revenues are then showing up on someone else's books. The issue is they don't report revenue or expense on farm schedule F. They will therefore never be... They can never be defined as a farm operation. Well, that goes to one piece of the regulation but not the other piece that I think is the focus of the disqualification. I think the answer to that is that the originating entity here, which is in our case M&T Farms, reports 100% of the revenue expenses. 100% on its farm income. All that revenue is accounted for and reported on a single schedule F by M&T Farms. So B&T sells some M&T produce. M&T reports 65%, 65 cents on the dollar of produce that it sells via B&T? M&T reports its fractional share as between itself and the individual C, Mr. Tognetti. Those are the fractions. But it reports 100% of what it produces on its schedule F. It's not reporting any fractional share of anything done by entity A. But it is reporting a fractional share of the revenue produced by B&T, correct? As the two individual farm operations, which is M&T Farms and Ed Tognetti, they are single and independent farm operations. I understand. And part of the problem here is a repetitive use of names. We have a partnership made up of an individual and M&T Farms. And that partnership is also called M&T Farms. Yes. So when I'm talking here about the insured, who am I talking about? I'm talking about one of the partners. Well, the insured obviously is M&T Farms. And we're the insured is M&T Farms. Am I talking about M&T Farms, the partnership or M&T Farms, the partner? B&T Farms is the name of the... They're not the insured. Okay. So B&T Farms is the partnership. Yeah, that's correct. No, I understand that. But the names are complicated. Am I talking about entity B in this case as the insured? That's right. Okay. That's right. So I guess, and this is a question I'll have for your friend too, as to the reasonableness of this. A two-part question. Why couldn't your client just reorganize? And why choose this structure, given this risk? There's a mixture of just accident history, more history than anything. And the idea is that through time, the consumer comes to know a name. Okay. And that's when they pull up alongside the road or however they purchase their commodity, they know that name. It's through time that it's always there. That's the goodwill. And no matter what happens out in the field, however they structure the farming operation, that doesn't change what the consumer sees. But you could, through change or a DBA or something else, you could rearrange... Your client could rearrange their affairs so that they do qualify for this particular insurance program. Potentially, but fundamentally, it just seems to me that that wouldn't be necessary. Because ultimately, again, as the fundamental issue is, is that B&T Farms is just not engaged in any farm, independent farm activity. Okay. Well, that goes to the interpretation, but I'm trying to understand whether it's reasonable. So I guess the second question is, this is a pilot farm insurance program. Correct. Are other federal crop insurance programs available to your client? Or does this interpretation of this structure knock them out altogether? This is a unique one because it's a whole farm income policy. And so rather than having each crop have a peril policy, you're looking at the entire farm and the entire farm income. But could you get standard crop insurance still with your structure? It would be a very different policy. But it's available. Other policies are available, but I'm not aware of any other policy like this one that is the whole farm. Well, and I think the fact that it's a pilot... Critical... And that it has some innovative features that haven't been fully interpreted all the way through probably goes a little bit to our reasonableness inquiry, which is why I'm asking. Correct. And so fundamentally, it's just a very simple... I do think the error is very simple, but I think the correction is very simple. We go back to the very basic premise, which is the simple, which is that Pellant M&T Farms produced 100% of its fractional share. But what you're asking us to do is to hold that B&T is not engaged in farming activity. Clearly. If it is engaged in farming activity, then you lose. Then I lose. Right. And if it's not engaged in farming activity, you win. That's right. Okay. So now let's get back to why isn't the activity produced by the two partners farming activity under the definition of the policy? It may not be farming activity under my sort of common sense view of it, but the policy seems to say that direct marketing is farming activity. I don't think so. I actually disagree with that. I think what direct marketing is relevant to is the issue of allowable revenue. It's simply an instance of, you know, fundamentally, the farmer has to get to the market somehow. And one of those ways is to go through direct marketing. And they're saying that if you do this direct, we're going to consider that allowable revenue. But no part of direct marketing that I'm aware of in this policy addresses specifically the definition of farm activity. So then following the kind of the game of telephone through these definitions, but allowable revenue is farm revenue. Allowable revenue is specifically revenue from the production of commodities produced by the farm operation. In this instance, the farm operation is M&T Farms. They produced 100% of their fractional share in this case. In contrast, B&T Farms produced nothing. All they did was stand as a storefront. Essentially, it would be an entity that its only asset is a name and a store and a sign so that the consumer knows what they're buying through time. Meantime, and specifically in 2017, the only relevant production that occurred was from M&T Farms. There was no other production. If you want to do one more question, I wanted to save a little bit of time for rebuttal. The handbook says a tax entity, which is your client, which reports a fractional share of farming activity conducted by a partnership, corporation or any other joint venture does not qualify for coverage on the fractional share of the farming activity. If that is a correct statement of what the policy provides, can you prevail? I think I can try to address that in a certain way. If we were here trying to ensure revenue by B&T Farms and B&T Farms was not a producer, I think that's what that is referring to. Well, but B&T Farms doesn't report a fractional share of farming activity conducted by a partnership. The question is whether your client reports a fractional share of farming activity conducted by a partnership. As between itself and the individual. Yes, yes. That's it. And you do. That's right. And so why isn't that enough to disqualify you under the policy? Because each is a single farm operation, separate and distinct. Each is an originating entity, separate and distinct. So in order to rule in your favor, we have to not only separate you from B&T Farms, we also have to separate you from the other partner, even though you're each reporting a fractional share of farming activity. The definitions allow that, because they are separate distinct farm operations. Who have combined into a partnership in order to form B&T Farms. They are partners in B&T Farms. Yes. Okay. Do you want to save any time, counsel? It's up to you. One minute. For about one minute. Thank you. Right, exactly. All right, let's move on. May it please the Court. Christopher Jue, Assistant U.S. Attorney on behalf of the Federal Crop Insurance Corporation and the Risk Management Agency. This case is about the agency's reasonable interpretation of an ambiguous provision in the whole farm crop insurance policy. You've identified the three major issues, which are, one, ambiguity, two, reasonableness, three, deference. Wait, wait, wait. You're talking about a policy. You're constraining that. But it's not a regulation we're constraining, right? Yes, Your Honor. And this will get to your deference question, which I believe the Court has on its mind. So of course, yes, our normally is applied to rules, namely regulations. In the world of federal crop insurance, the agency basically creates all of these insurance policies. If you look at the website, there's a laundry list of different policies. They're all created according to the agency's expert opinion and its statutory mandate to develop expertise, research development. It also has the duty to protect the integrity of the system. Well, I guess, Mr. G, I guess that's part of my concern, at least, with according deference to this is, in a lot of jurisdictions at least, when there's an insurance policy, we construe it against the drafter. And this is a case in which these policies are not merely public regulations. Although there are these private intermediaries, the Crop Insurance Association is, you know, maybe for lack of a better term, an underwriter. It's got some skin in the game here. So how do we, why should we extend our deference to what in this case looks a little bit like government self-dealing over its own insurance policy? Your Honor, we understand that by statute, there are basically multiple roles for the agency. And so that's the implication of self-dealing. But obviously, we don't think it's that. Yeah, that might be a little strong, but they are essentially, down the line, a counterparty or an underwriter of the very policy that they're construing against the insured. Yes, Your Honor. And they wrote their own policy. And as my colleague points out, in a normal insurance context, you would construe it against the draftsman. Because there's nothing in the record that I saw that they could negotiate this contract. It was a contract of adhesion. You can sign up for it, or you don't sign up for it. But you're saying, even though we drafted it, we implemented it, and so on, you still want us to give you deference and construe the policy in a way that disfavors the insured. Is that right? The short answer is yes, Your Honor. Now, the amount of deference, ultimately, I don't think it's going to be material. So, for example, skidmore deference is often afforded to agencies, as well, for things that are not in regulations. Well, let me ask the question differently. Let's assume this was a private insurance policy, and you were representing the insurance company. Would the case come out differently? Yes, Your Honor, but it's a different paradigm, because under federal— It would. So you think if this was a private insurance policy, and the same questions were raised, and you were the lawyer for Transamerica Insurance, they would be entitled to prevail because the policy is ambiguous, and we ought to— I'm sorry, Your Honor, to amend my answer. The answer is no, the outcome would not be different. We certainly understand that the presumption would be against the drafter, and so that would be some difference. And so we're happy to talk about the ambiguity, but let me also— You see, and that's why I'm having difficulty, some difficulty with your argument. You're saying, we're entitled to our deference because the policy is ambiguous, but you're arguing that the policy is not ambiguous at all. What you're arguing is that the policy makes quite clear if you report a fractional share of farming activity, then you're not eligible, and that the policy makes clear that farming activity— that B&T is engaged in farming activity. Your Honor— So tell me what I'm missing. Do we get— Do we need our deference in this case? Sure. So first of all, as a practical matter, we don't need our deference. Let me explain why our deference often makes sense. But it wouldn't come in unless it was ambiguous. Yes, and the term farming activity, of course, is undefined in this whole policy, and so that's one reason why it is ambiguous. But you wrote it. That's your language. I mean, when I say you, I mean— Yes, yes. This is the agency who wrote it. Of course. And I think we're all struggling with the fact that, at least in a private context, if you were State Farm, you'd lose. Just flat out, you would lose. Because it's your policy, it's a contract of adhesion, and you have written ambiguous language, you lose. This is the government. Why is this different? So Your Honor, to untangle a few things, first of all, let's keep in mind, this is FDIC interpretation. We're not actually finding facts, so it's the arbitrator that's going to find facts, whether they're going to get their money or not. So that's one issue. Okay. The FDIC is the arbitrator? No. There's a separate arbitrator. Okay. So all that you're doing in this case is pursuant to the arbitrator's request, providing your interpretation of the policy. Yes. But the interpretation is the agency has construed it, and it must know that, has construed it against the insured. The bottom line is, yes, Your Honor, but if we also back up a little bit, there are five different requests. This is the third one from M&T Farms, and basically their question in August 2020 was, can we basically meet either 3E or 3A4 in order to get our policy? And the answer is no. You need to comply with both. But now this gets to a question I've been wanting to ask in this case, and again, a question not brief, just like the whether our deference applies. The agency is giving its interpretation in response to questions posed by M&T. Yes, Your Honor. And that interpretation is going to go to the arbitrator, who is then going to construe the policy and determine whether or not there's coverage here? Well, they're going to apply the interpretation to the facts. That's my question. But in terms of interpreting the policy, we're now done. The arbitrator doesn't get to interpret the policy. Correct. The agency's job is to request FCIC interpretation. Then we interpret it, and for that matter, under the regs. So if the arbitrator had never requested an interpretation of the policy in this case, as I think you would — he's not required to, then he would be free to interpret the policy. I don't want to speculate as to what the other — The agency, and also the insurer, who wanted you to interpret the policy, the government to interpret the policy, in the absence of those requests, then this would get litigated in the normal course of event with the finder of fact or the finder of law interpreting the policy. Well, what would happen is there's an arbitration provision, and so they would arbitrate it, and they would figure it out. Yeah. The arbitrator would figure it out. Yeah. So in some — what we've got going on in this case is, in part, M&T getting what it asked for. Yes. It asked you to — it asked you to interpret the policy. You did. It disagrees with your interpretation, but it didn't have to get your interpretation. Correct. But what's even more is, actually, the court can ask for the FCIC interpretation, too, under the regs. Yes. So if the court's dissatisfied with what's going on, it can say, agency, please interpret. But, moreover — How can we penalize the insured for asking for an interpretation about the policy? That happens all the time in insurance policy. People say, I had a flood in my house. I think I'm covered. And they say, no, I'm not too sure about that. What's different? The purpose of the FCIC interpretation is to interpret the provision of the policy. It's for general applicability. So it's a benefit to the public as well as for the parties. And that's why it wouldn't answer specific questions about this coverage. It just answered questions about — Yes, Your Honor. So let's get back to your interpretation, whether it gets our deference or — Sure. So why is B&T Farms engaged — I think that — I think I'm right in saying that's the ultimate question. Mm-hmm. Sure. Is B&T Farms engaged in farming activity? Mm-hmm. It doesn't produce itself any commodities. It merely markets the commodities that are produced by its two general partners. So why is it engaged in farming activities? Well, it does more than that. Also, the crops are grown nominally in B&T Farms' name. So let's take this apart a little bit. It basically leads to the risk of commingling resources and also expenses and the risk of financial fraud. We're not saying that that's happening here. We're saying the corporate structure creates that risk. Here we have general partnership B&T Farms, M&T Farms, and Mr. Tognetti, ABC. Now, to the world, it's all B&T Farms. You get a receipt, B&T Farms. You get the labor expense — No, and I understand they report a fractional share of the B&T Farms in revenue. My question is why is B&T Farms engaged in farming activity as opposed to just marketing, as opposed to just selling the produce produced by the farming activity of its two partners? So yes, one part is that the direct marketing and sales that's expressly contemplated in the whole farm policy. Intuitively, we understand the situation of a roadside stand, a you-pick situation. Drive in your car, see the farm, B&T Farms. You walk in, give them $20. Here's a basket. Go pick some cherries. You're actually going on the farm. You're picking the crops. You don't give them money. I understand you don't know whether the cherries come from M&T or from the other partner. And that's part of the problem, too. Well, why is that a problem with the policy? See, I'm still — you say marketing activities are defined as part of farming operations. Mm-hmm. But — Well — And your friend says it's just a definition of what revenues are. It doesn't define them as part of farming operations. Well, it's farming activities, which is — Farming activities, right. Farming — I'm sorry. It's all right. Because the two terms get conflated here. But why is — why are marketing costs part of farming activities? Well, the direct sales, that's really the best example of why it makes sense for it to be — Do you think direct sales are part of farm activities? Absolutely, Your Honor. Especially the roadside stand, you pick farmer's market situation. Intuitively, I think we can all sense that the closer you are to the physical farm, the more it feels like farming. So again, you go to a you-pick stand, give them the money, you walk on the land, you pick the cherries. Oh, was that — were those cherries coming from M&T or from Mr. Tognetti? The answer is, I don't know. So you have the risk of error. You have the risk of financial fraud. Same thing with expenses. But you're not alleging either in this case, right? No, Your Honor. But you're saying hypothetically that could happen. Yes. And so the agency needs to look out for how the policy should be interpreted, including to protect the integrity of the system. But why isn't then the rest of the — for example, 211D, which provides for coverage on a fractional share, why doesn't that resolve it? I guess the — and I think we're in reasonableness land or unreasonableness land now, but these arrangements strike me as relatively attractive and common for farm partnerships. And you're just saying they can't be — even though the regulations themselves seem to provide for parsing the different revenue of the different entities, that fractional share, you can have an insurable interest in that. Why would the agency read this not to cover them, then? Your Honor, the answer is that there's a tension about the amount of complexity that's permitted. And the reason is the risk of financial fraud and loss. Well, there's complexity here on both sides, right? I mean, if you don't like complexity, write a clearer policy. But, Your Honor, one example is disregarded entities. Basically, they're trying to figure out the right line there. In terms of farming activities, basically, there's the 3A4. There's also the pass-through entity provision. There's also — let's keep in mind the maximum revenue of $8.5 million. And so basically, it's designed for relatively small operations. Let me focus on 3E for a moment. Mm-hmm. 3E says the pass-through entity may ensure various things. So could B&T Farms, in this case, have obtained this policy? The short answer is it doesn't look like it because they don't meet the other types of requirements. There's other reasons why they couldn't. Yes. It appears that it would not be eligible. OK. And then you say M&T Farms can't do it because of — 3A4. 3A. 3E — because they're not a pass-through entity. 3E doesn't disqualify them. They're just not — We don't think that 3E disqualifies them. Yeah. Right. So we're really talking about 3A4. Yes, Your Honor. OK. And you say that under 3A4, they don't qualify because — tell me again. Because B&T Farms, its affiliate, is engaged in farming activities, which include the crops are grown nominally in its name, and that leads to the risk of mistake or financial fraud. OK. But here's what I'm going back to now. 3A4 says your Schedule F must cover 100 percent of your farm operation. And if we view M&T as a standalone entity, their Schedule F does cover 100 percent of their farm operation. Does it not? According to the situation presented, yes. At least you didn't find that it didn't. Well, there are no factual findings here by the agency. Yeah. But I mean — OK. So then it must be because of the second — of the parenthetical language that you think coverage is not provided under 3A4. Yes, Your Honor. Just the parenthetical. Right? A tax entity which reports a fractional share of farming activity conducted by a partnership, et cetera, doesn't qualify. So we're still back to whether or not B&T conducts farming activity, right? That's the essential question. Yes, Your Honor. And in brief response, one, growing crops anomaly in its name, that leaves the potential for financial fraud and comingling. Two, the direct market — Well, see, the problem is I understand the reason why one would want the policy to be the way you want it. The question is whether it actually — that's a reasonable interpretation of the policy. And you made no such allegations against them in this case. Your Honor, again, the purpose is — No. Yeah. No. — interpretation of — If the policy is structured — is actually structured the way you say it is, there's a good reason for it, because you want to not be in a situation where you have to worry about fraud. But that doesn't help me in determining whether the policy should be reasonably interpreted the way you say it should. Your Honor — That's just a good reason to interpret it that way. Your Honor, within the text and structure of the policy, there are many provisions that support a sort of non-common-sense view of farming, such as the resale of commodities. Because from a common-sense perspective, you buy crops. If you put them in the barn, that feels like a farming activity, and you resell them. But if you buy them, put them somewhere else, and resell them, that feels less like a common-sense — But I am corrected at the end of the day. The question that needs to be resolved and is engaged in farming activity. Well, within the scope of judicial review, it's really a question of whether, even if the court — I know you're saying it's whether you could reasonably say that. Yes. But I mean, that's the ultimate question at the end of the day. Yes. But — and I'm sorry, I know we're way over time, but you can answer my colleague's questions if you have additional ones. Yeah. So — Like I was saying, you're over time. Yes, I apologize. But we thank you very much for your argument. I know you could say a whole lot more. You're a good lawyer. We appreciate your argument. I think we've got it. Thank you very much. And let's hear a rebuttal from BNP. Thank you, Your Honor. Thank you very much. Just briefly here, Your Honor, to go back to the point of the policy, it is to obviously provide insurance to the originating entity, the farmer. That's the point of it. And the concept — Why don't you speak up a little bit? Yeah, and the concept here is not a complicated one. Well, but you're talking about purpose of the policy. Yes. What I'm trying to figure out is whether or not this exclusion in 3A4 applies to you. Policies have all kinds of purposes, but there's a specific exclusion in 3A4. And to make that exclusion apply, you would have to conclude, obviously, as we've been dealing with, that you'd have to conclude that B&T Farms is a separate farm operation. No, you'd have to conclude that it's a separate operation. You'd only have to conclude that it engages in farming activity. And what we have in B&T Farms is somebody that's selling produce produced by its two general partners. Selling, not reselling. Okay. Selling. Selling. So — For the original — It's selling direct on behalf of the originating entity and nothing more. And that's the fundamental concept. The originating entity here is B&T Farms. No other. In this — purely in this channel of commerce. Okay. Other questions? Thank you. All right. Thanks to all counsel. We know there's a lot more that you could say, but the case just argued is submitted and the Court stands adjourned for the week.
judges: SMITH, HURWITZ, JOHNSTONE